This case is submitted as of today. Looks like everybody, well two are in person and ones be a video on the next case. So we'll go ahead and have counsel come up to the tables. Mr. Hatfield, are you there? This is the Kossen case. I'm sorry. Sorry about that. Maybe I should have been more clear which ones. We've got Mr. Boudigin here. Is that correct? Then we've got Mr. Pixley. I think you may get the award for having come the farthest from Saipan, it looks like. Ms. Trotman, you're on. So we have everybody. So we'll be starting with Mr. Boudigin. If you can state your name for the record when you step up and also how much time you plan to reserve. And then we've got two counsel on the other side splitting time. And so in order to make sure that everybody gets their time, you'll have separate clocks. So Mr. Pixley, you've got five minutes and I think you'll have ten minutes, Ms. Trotman. All right. Mr. Boudigin, you may proceed. Good morning, Your Honors. My name is William Boudigin. I represent the petitioner, Darin Cosson, who's a pilot. And I reserve five minutes of my 15 for rebuttal, if I could, Your Honors. You know, I have a question while you're getting prepared there. It seems like you're launching up like an all, all hands on deck assault on how, how this court is to review administrative appeals. Like, for example, from your brief, you just kind of come out and say you disagree with the substantial evidence test. So, so when I read something like that, I, what my reaction is, you're asking us to do more than apply the law to the facts. You're asking us to change the law. Is that what you're doing here, Mr. Boudigin? I am. Okay. So why don't, why don't you tell us about that? And why should this panel overturn the substantial evidence test? In fact, it comes from, in fact, it comes from a regulation, doesn't it? A CFR. Right. But how it's being applied by the ALJs and the ARB is not inconsistent, in my opinion, with what was intended by the statutes that lay that test out. The, the, the case law seems to say, you find any bit of evidence to rely on as an ALJ, that's substantial. Because it's not about substantiality, about materiality, more importance, priority, greater weight, that any evidence that the ALJ latches onto, it's not about those factors. It's not about the factors that every court in America today weighs when they consider facts. All the ALJ has to do is say, I find some facts over here, and I totally ignore, totally ignore contradictory clear facts. Right, you say in your brief, you say, this is too hard of a standard to overcome, and not in line with the professional goal of Air 21. Right, because whistleblower can never win. Shouldn't you be lobbying Congress, or lobbying the administrative agency to change? Isn't that the right branch of government? Well, I have a two-prong attack on this, and that is, I've reviewed so many Air 21 cases. When I first took this case, I did it as an assistance to a pilot friend who couldn't find any attorney to take it. So I called lots of attorneys that deal with Air 21 cases, and most of them said, I will never do another one. They all say, one in, one out. Because the standards are ridiculous. If you look at the results from the actual ARB decisions, and then the ALJ decisions, and then the ARB reviews, you can't win an Air 21 case. You have 90 days statute of limitations for whistleblowers to file a suit on things that happened to them, only within those 90 days. I don't know of anyone that can grab a lawyer, find a lawyer, and file a complaint, and do that within 90 days. Most of these situations that whistleblowers are in, they're exactly like Darren Cousins. When in July of 2017, he went into his chief of pilots, and he went into Ralph Freeman, the director of operations. He went into these people, sat down with them, and said, we are having unqualified people be in captain position. The law is clear. The law changed, and you haven't done anything about meeting the change of the law to a thousand hours. He told them that, and they said to him. I think if they retaliated for him saying that, then I think you have a case. Why don't we focus on that? I wouldn't have a case, your honor. We might be feeling ambitious today to strike down the substantial, but it might be a tough road to hoe. You've got about six more minutes. Why don't you tell us why applying the standard, the substantial evidence standard, why your client wins? You have arguments. Because in the review of the standard evidence rule, you get to look over here at whether the decision process was arbitrary, capricious, contrary to the law, and you have over here, you have clear and convincing evidence standard that will knock out. Let me see if I can pull you down to what, like, that your client said I'm quitting, right? He resigned. I don't think, there's no factual, and then he unresigned, it seems like. It's a little more gray, but it seems like he unresigned. It's kind of gray as to, like, it doesn't look like he, is there a, do you disagree that he unresigned for some limited period of time? In other words, he, he rescinded his resignation for, for only a period of time. He didn't, he didn't say I'm gonna stay on forever. Right, neither the employer accepting it, nor him, and making the conditions where he says I'm staying, said that it was only for the month of December, and that's what the ALJ rule, that's ridiculous. Well, it kind of seems like that's what the employer's saying. I, I, what is the, this is what would be helpful to me. What, what is the rule, so I come in, and I, I'm a pilot, and I say I resign. Okay, so I assume you have some sort of contract, and you, and you're, and you're a pilot, and you're flying out of that contract, but now I'm saying I'm, I'm resigning. Now I come in a few weeks later and say, okay, I'm not resigning, but it doesn't look like they ever really entered into another, another contract. It looks like there was sort of an understanding that he was unresigning, for lack of a better word, for some period of time, but the disagreement seems to be how long that was. Was it just for the month of December, or was it for all the way through March? And so, what, what standard should we, let's, let's assume for a second that the two of them had different ideas, that A, A, his bosses at APA thought it was only for that month, and he thought it was through March, or let's assume for a second that he even told them it was through March. Do they, do they necessarily accept his, his recension of his, of his resignation through March by not saying anything? Because I, here's what I think happened here. Here's what I think, looking at this. I think what happened is he resigned. They really needed him for December. He comes back in and says, I want to stay on. They say, we really want you for December, but we don't know if we want you clear through March, because by this point, they're starting to think he's going to leave anyway, which he is, right? He's, he's already told them he's going to. So, but they don't want to upset the apple cart, so they just let him work through the month of December, and they let him go. What, I'm trying to figure out what, if that's what I think happened, what standard applies to that? Because he did resign. And do they have to take him back all the way through March, or can they basically say, we're just, we're going to take you back only for the month of December? Okay. First of all, he did not resign. He did resign on November 22, but he didn't come back in, like you say, and say, take me back. He didn't do that. He told them, I have a job at Empire. I'm leaving December 8. He told them that. He didn't go back to them and say, I want to stay. It was the other way around. Look at the emails. The emails are from the company. And what testified to meeting with him, testifying and test and said, I took, I convinced him. Eventually, he, I assume, agreed to stay, right? Instead of resigning two weeks out, like he originally said. Yes, he gave up that job at Empire. He did. He didn't go on December 8. He worked through December. But more importantly, he's working in January. He's actually working in January. He's on the schedule for February. Now, the only thing that got him fired was the day of the firing, two pilots were taken down to FAA and grilled about their hours and not being qualified to fly. And the president testified. He was at the hearing. He testified and said, yep, that's the day I said, he's gone. And they cooked up this concept that the resignation from November 22, which was effective December 8, was still alive and still hanging out. They're that is poppycock. That's the most ridiculous thing. That would mean that there would have to have been an agreement between them that the resignation was still hanging out there and that they could do that at any time. When did he withdraw his resignation? On December 6, he met with Ralph Freeman. Ralph Freeman said, stay. That's a crazy idea to go to ATRs. It's ridiculous. How can you go from a Yeah, you're going to they're going to make you captain and you'll make more money than you are here. But stay with us. We are buying a new 757. When he withdrew on the on December 6, his resignation, is that your position that he told them and I'm withdrawing it through March? No. Okay, when did he tell them through March? That's not when he said that. When he what he did is they email back and forth the next day. Nutting and Freeman both emailed him said, we're glad you're saying that's a good decision. Now, it is true. There is a sentence we thank you, we really need you in December. But there's nothing else from the email and go back to Empire and say, Oh, they've only letting me stay till through December. I need my job back. And that on the training, I was going to start on December 8 at Empire. I need that right back because I'm a father of kids. When he when he emailed Empire, he didn't tell them, I'm actually going to stay with APA. He told them I've my father's got health problems, right? Well, it is true that that's what he said. And you know what the response from Empire was, and it's in the exhibits. Empire said, Fisher cut bait. They said, if you don't come here by December, and I think it was the 22nd, if you don't come here by this date, you have to totally reapply. We're not saving a job for you. Go away. We're not we're not. And what was his response to that? His his response is he didn't show up. His response to that, as I recall, was, I'm staying with APA. Yes. No, that was not his. He said his response to everyone at APA. I'm staying with APA. There's emails with with San, Joe San. Who's who's the response was, his response was not that I'm staying with APA. That's not what he said. He didn't respond. No, he responded and said, well, I something about that. He was looking forward to applying again or something like that. It's something to the effect that if it comes out this way, I understand. I got to reapply, start all over with you folks. That's what he said. He didn't say no to them. He didn't say yes to him, but it didn't matter. He'd given up the job. He did not go on that date. And they were perfectly clear about that. And in fact, the evidence said he planned to apply again. Is that correct? He applied to plan again. No, he said he would. No, he said, if I need it, I'll apply again. I understand you. I understand your words. Your words are I don't have a job. And I've got to start all over with you guys. And if I don't get a job later because I have to apply again, I have to apply again. And note, when he got fired, he didn't go back to Empire. He didn't even ask at Empire. He withdrew his resignation on the 6th. Did he ever receive any kind of notification from APA, Freeman or anybody else? Yes, two emails. That they accepted the withdrawal of his resignation. And we're just going to continue on as before. Business as usual. Did they ever send anything? OK, two points that. Yes, two emails, one from Nutting, one from Freeman saying, you're making the right decision. Glad you are staying. One of those emails did say, we were glad you're staying because we really need you in December. When we got that, we understand that they really needed him. They were short pilots. This crazy argument that they made later that they hired other captains after his resignation on November 22 is just factually false. The judge is just wrong on that. The evidence in the actual case proves that they were that they that the two pilots that were hired were hired before him. And and the proof is in the pudding on the on the on exhibit number CX 65, all the pilot schedules when they were having their test flights. Their test flights were on November 26. You cannot get trained, never having been licensed or flown a 757 before. You can't get trained and have your check ride, FAA check ride on the 26th if you were hired after the 22nd. So you're down under two minutes. I want to make sure that if you reserve, do you want to keep those two minutes for rebuttal or? You're saying I have two minutes left until one minute, 43 seconds until I have what I what I reserved. No, no, no. You've got one minute and 40 seconds. OK, well, I apologize. The time flies. Why don't you go ahead and let my colleagues have further questions. Why don't you go ahead? I apologize. I mean, so there are courts that say, OK, you hit your reserve time. I'm I'm so sorry. I stop and I reserve those. Thank you, counsel. We will hear from Mr. Pixley for five minutes and then we'll hear from the government. Good morning, Your Honor. Please, the court, Stephen Pixley. I represent Asia Pacific Airlines. But I was reviewing the case and I took a long flight from Saipan and read 807 pages of transcripts. I think I recall what happened back in February of 2020 during the hearing. The case, I think, can be capitalized in seven words. Darren Carlson wanted to be a captain. He was hired by Asia Pacific Airlines back in October 10th, 2017, as a first officer. He was sent off for training for seven, five, seven training, got a little bit of time. And, you know, Judge Pai has asked a question, I think, that kind of really gets the heart of it, which is what happened when? Everybody agrees he sent this letter of resignation, two week resignation. So what happened after that? What did APA do in response to that? Did they ever give him anything that said, OK, you're rescinding your resignation and you're back to your, you know, because it seems like your view is that they kept him on sort of temporarily. Correct. Seems like his view is they kept him on temporarily, but longer, although we're hearing something different. I want to hear kind of what happened during that period of time. Yeah, I think the one thing we there's a huge dispute between the parties, as you know, regarding material facts and issues in the case. But we can all agree that he did submit his resignation on November 22, 2016. Prior to that, he asked for for leave of absence for the month of December because he knew that that was well, he knew that that was a busy month for Pacific Airlines. On December 4th, there was evidence in the record that December 4, that Darren Costin met with Ralph Freeman. I think it was right before Darren Costin was on a flight to Guam. They met in Honolulu and discussed the resignation. And during that discussion, it's my understanding that Ralph Freeman basically said, we, you know, we really need you during the month of December. And there's testimony in the record that's when East Pacific Airlines makes its money. They have contracts with UPS, Amazon, holiday shipments and that sort of thing. So it is what they call a heavy month. In fact, Adam Ferguson testified that they basically met their expenses during the rest of the year. It's kind of like Black Friday. All of a sudden, it's December. So what happened? What happened? What happened with this conversation? Go get sidetracked. Okay. No. Okay. So basically, it's our it's our position. He agreed. Costin agreed to stay during the month of December. And he was supposed to be training for the evidence of that, as opposed to saying, I'm rescinding my resignation. You're on for forever. Well, Adam Ferguson testified that he he he was there. There's one thing you should be aware of. Adam Ferguson was based in Guam at that time. Ralph Freeman was in Honolulu. That's where you have two bases for the airlines. Adam Ferguson told basically Ralph Freeman just to get him to stay during the month of December. That was testimony at the trial that's on the record. And that's what happened. ALJ, if I remember right, the ALJ credited that and did not credit Costin's contrary testimony. In other words, found that to be credible, but did not find Costin's testimony as credible. Yeah. I don't want to attack Mr. Costin too much, I suppose. But the Ministry of Law judge found his testimony to be compromised. And I think it was. I took his deposition July 10th, 2019. And he said that he contacted Empire when he decided to have this conversation and said he was he was staying with Asia Pacific Airlines. He was no longer interested in the job. That was a falsehood. I flew to Coeur d'Alene, Idaho in January 2020 to the deposition of Pete Brochette. That transcript's in the record. Pete Brochette said, no, that didn't happen. He never pulled his application. He always intended to leave Asia Pacific Airlines. And that was known by individuals in Asia Pacific Airlines. It's a small airline, 20 pilots. They knew that. He never intended to stay. In fact, if you look at his application for unemployment with the Hawaii Unemployment Commission, which is which was an issue raised in the appeal, as you know, he initially told the investigator Gator Kwok that he'd been laid off due to. So it seems like the record supports that at some point he didn't plan to stay because at the end, he's really only arguing that they should have kept me on until March, not beginning of January. When did and there is that email, I think, that says we are not accepting your attempt to extend your residency until March or something like that. Right. When did that happen that he asked for March? Do you know? I'm not I'm not certain exactly when the record not clear about that. No, it was in the alluded to the application for unemployment insurance. That was in that record also that he basically told them that he agreed to stay through March one. To the extent it's relevant, he was actually paid when he was when he was given when Pacific Airlines accepted his resignation January 12th of 2018. He was paid through February 15th of that year. He paid five thousand dollars. I believe the record shows. Well, we might do either. My colleagues have any more questions for. All right. Well, thank you. Thank you very much, Mr. Pixley. And we'll go ahead and go to the government. You have 10 minutes. Mr. Trotman. Thank you. And good morning. My name is Shelly Troutman and I represent the secretary of labor in this case. The ALJ's decision in this matter, as affirmed by the Administrative Review Board, is supported by substantial evidence. Counselor, can I ask you a question? It's kind of been so let's say I'm a pilot and I say and I say I'm quitting in two weeks. Right. So like in this case, but then sometime within the next two weeks, the airline talks to me about staying on. And so we reach some sort of agreement about me staying on. But I've already I've already I've already repudiated whatever our former agreement was. And so what happens if like what governs? I assume that these pilots have contracts, written contracts, but we're not. The record does not state whether Mr. Carson had a contract. It is my understanding that there was not a contract. But what is the legal effect, I guess, if pilot. So what is the legal effect if I say I'm going to I'm going to retire and if there's no contract, I say I'm going to I'm going to not retire, but I'm going to I'm going to leave in two weeks. But then I change my mind and I tell the airline now I want to leave in four months. But the I mean, the airline lets me stay on because, you know, they want me to stay on, but they don't necessarily want me to stay on for four months. What is the airline bound to keep them for four months? That's what I. Your Honor, I believe that would be dependent on the circumstances at issue and whether the contract governs an extension of work, a rescission of a a taking back a. Well, I guess let me say in this case, what happened was Mr. Carson rescinded his resignation. That fact is clear. It's in the record. The record, as as you were just discussing with the other parties, is not clear exactly what happened after that. But the ALJ looked at the record as a whole in this case and determined that substantial evidence shows that Mr. Carson resigned and that record actually is unclear whether he rescinded that resignation. Well, he did. He did. He did rescind it. They they just said, I mean, he he rescinded it. The question is, what happened after that? Well, Your Honor, I think it is important to note that the ALJ did not accept into evidence the email of Mr. Carson supposedly rescinding his resignation. But you don't even need those emails. He said he was going to leave in two weeks and he didn't leave in two weeks. So I think like you're not you're not you're I didn't think you would be disputing that he rescinded his resignation in some sense. Right. Well, OK, let's assume that that's we accept that fact is true, that there was a rescission of of his resignation. What the ALJ was tasked with was to apply the requirements of their twenty one statute and to determine whether Mr. Carson proved by preponderance of the evidence that he was retaliated because of his protected activity. And in this case, he decided the ALJ determined that you know, it's like the Johnson's Council. You realize the reason that I think this matters, at least to me, is if if the airline was only thinking, well, we've got to keep them through December, which seems to be the argument that was made. We've got to come through December. Then it's a lot more plausible that they just went ahead and executed their plan of letting him go after he stayed through this heavy season, whereas his view is, as you heard this morning, that that no, this thing happened. And then they you know, they were going to keep me for longer than that. But then they're retaliating. So it kind of it makes a big difference if the airline if we think the airline had just committed to keeping him through the month of December, basically. Well, the ALJ did look at this causation factor that Mr. Carson must prove, and they essentially said, look, assuming that Mr. Carson was terminated in January, Mr. Carson still cannot prove that that termination was caused by his protected activity, which is really the crux of the issue here. Was he terminated or blacklisted or not given his his his update to upgrade to captain because of his protected activity? And for the reasons in the record, the ALJ determined that Mr. Carson could not show that a supposed termination was caused by his protected activity, whether he stayed on for December or through March. So the ALJ was really tasked with looking at the record before him. And. Assuming that Mr. Carson stayed through January and there was a rescission of his resignation, it's really it goes to this causation issue, which which Mr. Carson is burdened with showing and he did not ALJ described the resignation as an intervening event that that interrupted the chain of causation. Is that right? Yes, your honor, that is right. And, you know, there is one way to show causation is a temporal proximity between a protected activity such as an FAA complaint and an adverse action such as termination. But an intervening event, as you say, your honor, can interrupt that that temporal proximity. And why why would it be important for an at least from an employer's perspective? Why would that be of significance to an employer if an employee, you know, perhaps at the beginning or on the cusp of the employer's busy season says they want to resign? But then later, but later perhaps rescinds the resignation. What what would be the significance of that from an employer's point of view? Yeah. And the ALJ considered this. He determined that the Mr. Carson's resignation right before the busy season reasonably and understandably led APA to have a lack of confidence in Mr. Carson. It required APA to determine other schedules, have new pilots coming in. It understandably and reasonably interfered with Mr. Carson's employment. He set the ball rolling, as the ALJ said, to his ultimate, you know, departure from APA. So this his his resignation, Mr. Carson's resignation is that intervening event that independently. I was going to say, didn't didn't he work through December? Yes, he did. And that is the evidence. The record demonstrates that APA asked Mr. Carson to stay through December because, as you heard from Mr. Pixley, that is APA's busy month. So I do want to also speak to Carson's employment with Empire Airlines because I think there was a little bit of confusion earlier. The record demonstrates that Mr. Carson accepted this job, this captain job with Empire, causing him to resign from APA. However, he never completely withdrew his application from Empire Airlines and instead just asked for a later start date. And this, the ALJ reasoned, further showed that Mr. Carson had no intention to permanently stay at APA. And this is another reason that APA had reason to doubt Mr. Carson. And of course, this was further demonstrated by the fact that he did begin his Captain Empire job with Empire shortly after these events. So as I mentioned before, the ALJ is tasked with looking at the record as a whole and determining if substantial evidence. Supports a finding. And in this case, the ALJ reviewed the evidence. He made reasonable credibility determinations. He appropriately weighed the evidence and made these appropriate evidentiary admissibility determinations. And I'd like to to to address the fact that the petitioner, Mr. Carson, has waived several of his arguments by either not preserving them for the ARB before the ARB, which he is required to exhaust his administrative remedies, or by not clearly briefing the issue before this court. So, but in any event, the ALJ's determinations are supported by substantial evidence and were otherwise not an abuse of discretion. Mr. Carson has failed to explain with any particularity how the ALJ's decision is not supported by substantial evidence or was an abuse of discretion. So unless there are any other questions that I would be happy to answer. If somebody if somebody wishes to change the substantial evidence standard that the court applies, how does one do that? Well, the substantial evidence standard is brought to be essentially by the Administrative Procedures Act. So it would be my understanding that they would need to petition Congress, maybe convince you all to to change case law. But it's a it's a standard that is well developed in the courts through this court specifically. And I believe that the ALJ's decision, as affirmed by the ARB, is supported by substantial evidence. And I ask, request that this court deny Carson's petition for review for that reason. Thank you. All right. Well, thank you, counsel. We will go ahead and go back to Mr. Carson's counsel. I think you have about a minute and 42 seconds, it looks like. There is no substantial evidence supporting what the ALJ did. The ALJ left out all the agreements between the parties regarding the rescission. The ALJ said there's nothing in the record supporting that. The ALJ is incorrect in the deposition of Mr. Carson, which was admitted into evidence and put into evidence by APA and the attached emails in the exhibits to the deposition. Those are already in the record. The ALJ missed it. He's saying I'm making up substantial evidence. Here's what he did. He said that doesn't exist. I I'm going to believe APA on the stand saying he was only going to say through December there's no evidence of that. That's only the testimony of the president of the company and Ralph Freeman. He was judging credibility. He was judging credibility. But there's nothing to support what he said. The prior fact has a fair amount of. There's nothing to support that what he said. Why? Because in the emails to him, they said, don't take empire. And this is important. They came to him. Give up your empire job. Come stay with us. And they promised him Ralph Freeman promised him that he would be made a captain soon. They had another plane coming on. They were definitely short pilots. And they when they got rid of him in January, it was a total pretext that they hired people after him. It's just not true. They didn't hire people after he resigned. November 22. It is not true. And what's the importance of this? There's no substantial evidence to support any of the theories of the ALJ. There's nothing in substantial evidence. He's not citing to any exhibits whatsoever. He is solely relying on the testimony of APA's people that was given at the hearing. And he came to a conclusion that they're more credible. How can that be versus the documents? For goodness sakes. The documents show that they they accepted that rescission of resignation. They put him in a plane. They had him working in January. They had him on the schedule through February. And he's coming back from from being on his days off. That's in the schedule for January. And he's coming back to work the next day. And they email him and they say, tell us a little bit about the causation factor, though. Because because let's say you're right. And can it be that that just that the airline decided that this is an unreliable employee, that this person threatened to walk? They actually resigned. We can't rely on this person any longer. And that's why he was separated as opposed to retaliation for the whistleblowing activity. That would be nice if there any evidence of it. There is not. There's no evidence of it because we asked them on cross-examining. We asked the president of the company and we asked Ralph Freeman and we said, is there anything in his file that's bad as an employee? Anything? No, he's our number one pilot flying the most hours. And and he's never he hasn't been sick except for one time. And it was excused. This guy has nothing in his record. And then the flip side of that coin is what what is your evidence in the record that supports causation, because in order for your client to win, he he has to establish causation. But this is where the ALJ went wrong. So so just tell me what here's what evidence. Here's what he went wrong on. He is supposed to look at the prima facie case. The prima facie case, he said, is made. He complained. They knew about it and they started to do things against him. They didn't make him captain. But most importantly, the biggest violation before being fired, the biggest adverse action the company took against him is they took a man with a job as a captain in another airline, went to him and they told him stay. They lulled him into staying. That's an adverse action. And they did it sneakily. They didn't lay out any of the parameters of how long he'd be staying. So when he comes back from his days off in January, they say, oh, well, you have a resignation that's still effective from back on when you were supposed to leave December 8th. This is wrong. It's wrong. It's not substantial evidence. The ALJ did wrong here. And then the ARB, what they did is make no findings of fact and no conclusions of law. They rubber stamped it. Do you need to hear any more? All right. All right. Well, thank you, counsel. We've let you go over about two and a half minutes here. So thank you. And this case is submitted.
judges: PAEZ, VANDYKE, Liburdi